Case No. 19-5261. K. Wendell Lewis, et al., of Balance v. Pension Benefit Guarantee Corporation. Mr. Shelley for the Balance, Mr. Crittet for the Appellee. Mr. Shelley, good morning. Before you begin, let me welcome on behalf of Judge Ginsburg and myself our newest colleague, Judge Walker. This is his second day of argument. I was hoping it would be his first, but this is his second, and we're awfully glad to have him on board. So if you will proceed with your argument. Thank you, Judge Henderson. Good morning, and may it please the Court. This is Anthony Shelley. In this appeal, the Court is faced with a unique situation, the rare instance in which a federal agency is required by statute to act as a fiduciary. With that fiduciary status comes the judicial review standards associated with fiduciary determinations, which means no deference to the fiduciary statutory constructions and limited deference to contractual and factual determinations. On top of that, the fiduciary is to be guided by the goal of protecting beneficiaries, sharing information with them, paying the greatest possible benefits to all, and fairly considering, even raising for the beneficiaries, all necessary arguments to get benefit adjudications right. In the PBGC's decision here, the PBGC on the substance got things very wrong, straying from its obligation to ensure the payment of benefits to the maximum extent possible, and the District Court then compounded the errors by giving the PBGC the maximum deference it could, as if we were in the heyday of Chevron for a federal agency, as opposed to reviewing a fiduciary's decisions. I'd like to address the review standard first, and then turn to the merits of the particular counts. The first standard of review issue is whether Chevron deference should be afforded to the PBGC's statutory constructions. Davis 1, the decision in Davis 1, plays large in the briefing as well as in the District Court's decision, but at best, Davis 1 is to be accepted for the arguments it reached, no more, no less, and it reached only one argument, and that was whether deference should be afforded, should be denied the PBGC because a private trustee in the same situation acting under the PBGC statute wouldn't, and the Court said no, that wasn't sufficient to disallow Chevron deference, but that's all it said, and it's not the be-all and end-all for Chevron deference to the PBGC as a fiduciary because Davis 2, in fact, said that. It didn't accept it as such, and instead avoided the question. Moreover, and it just, it didn't, it said, it didn't draw back from Davis 1. It said under any standard it made its ruling, so I don't see that it's cut back on Davis 1, and I don't see that when Davis 1 said that PBGC is not like a private fiduciary, that says to me we give it Well, in Davis 1, the Court said for the reasons, for the reason it considered, we give deference to the PBGC on its authoritative, its authoritative constructions of the statute, and even assuming Davis 1 is, is, is, remains binding on more than even what it reached, the Court can always consider a new Supreme Court precedent that came afterwards as to whether it and the Jicarilla case came after Davis 1, and Jicarilla says that where, where a federal agency is by statute ascribed fiduciary status, you treat it as a fiduciary, and so that undermines Davis 1, but also importantly, taking Davis on, Judge Henderson, taking Davis on its terms, Davis 1 on its terms, it says that only the authoritative, the authoritative determinations of the PBGC are entitled to Chevron deference, and the Page case from years earlier says that decisions only of the Board of Directors of the PBGC are authoritative on policy issues, and no one, no one thought about this in Davis 1, and so the issue sort of lurked in the case, much like the Court's stated in the old Westfall case from the Supreme Court, or Justice Gorsuch recently stated in the Jander decision, if an issue is just, Mr. Shelley, was Jicarilla a it was not, it was not a Chevron case, it was a case about whether the typical standards of privilege law would apply from, from trust law would apply to the government in a fiduciary status, and the Court said because they weren't given fiduciary status by statute, you couldn't apply, you could not apply the typical standards. If we were to not apply Chevron here, um, would we be saying that Davis 1 should not have applied Chevron? Uh, yes, you would be. You would be saying that Davis 1 was not incorrect on the basis it reached, but Davis 1 can't govern the case, a case where, for instance, the Supreme Court subsequently has determined an issue contrary to Davis 1, but also that Davis 1 only went as far as it did, had it gone further and considered whether the PBGC Appeals Board's decisions were authoritative, it couldn't have reached the decision it did. But, but honestly, a precedent is a precedent in the sense that it may get updated by later Supreme Court precedent, or further thought about what it said in considering the issues may further amplify on what the precedent meant. So, Davis 1, um, Davis 1 says what it says, but given that it used the word authoritative as to what the PBGC did, and there's, in our view, no question that what the Appeals Board did is not authoritative because it's not what the Board of Directors, uh, it's not a Board of Directors decision, it's not authoritative. Billy, um, I thought I heard you say when a subsequent Supreme Court case arises that, in this case, uh, it has and has overtaken Davis, you referred to, to, uh, Hickory, yes? Uh, Jicarilla, the 2011 case from the Supreme Court. Okay, the only one cited in your brief is the District Court opinion. Uh, I don't believe that's, let me just double check on that. For the index, maybe it appears later. It's called United States versus Jicarilla. Okay. Thank you. Sure. Uh, and that is, uh, it's two years out, yeah, two years after the Davis 1 opinion. Aside from Chevron deference, the second deference question is whether the PBGC is entitled, uh, to deference under the arbit- under a APA arbitrary and capricious standard for its, uh, for its factual and contract interpretations. And the issue may not actually be a, uh, be needed to be decided, in a sense, by the Court because, uh, as we noted in, I believe it's footnote 4 of our some cases say when it's interpreting a contract because the courts, uh, interpret contracts generally. And in addition, there is some, um, suggestion in the case law that if the agency, if there's a structural conflict of interest the agency might have in a case, it's the deference to it is less. That's what ERISA would say. And if the Court were to follow those cases under the APA, it makes no difference whether the Court says that the, the deference standard on factual and, uh, stat- factual and contract instructions is the APA standard or the ERISA standard. But we would say for purity the ERISA standard of review is the one that applies, which is an arbitrary and capricious standard, uh, tempered by the fact that there's a structural conflict of interest in with the PBGC because it, uh, enjoys the fruits of the funds it holds, uh, in, in trust here. And the longer it holds them, the more, uh, the more money the PBGC is able to use for its own operations. And how do you distinguish U.S. Steel, an opinion that Judge Randolph authored? U.S. Steel wasn't a situation where the PBGC was acting as a fiduciary. It was acting as a guarantor, which is in its sovereign capacity or, uh, as opposed to this situation, which involves the asset allocation system under Section 1344 of ERISA, which is only, only a fiduciary capacity. On the substance of the claim, uh, the claims, so on the merits, I'd like to turn to, um, I'd like to turn to, uh, count two for a second. This is, this is the, this focuses on the PC-5 category. And our assertion in the claim is that the PBGC erred when it refused to take into account and subtract from its allocation awards the follow-on plan benefits that the active pilots obtained. Had the, had the, uh, had the court, excuse me, had the district, the PBGC done that, that would have meant the entire $569 million in PC-5 would have gone to retirees. The PBGC should have done this because, uh, ERISA required it as a fiduciary to pay benefits, not award windfalls to the actives. And in addition, the plan term specifically said that benefits, related benefits that the actives received should have been subtracted. The district court really focused on the, uh, on the terms of, uh, on the terms of the plan and the terms of the plan actually required the subtraction. Um, and so we would say on this very large issue that's worth a significant amount of money, the PBGC got it wrong. I see that I'm in my rebuttal time, so I'd like to reserve my time for rebuttal. All right. Uh, Mr. Kretik. Uh, good morning to the panel. Joseph Kretik for the Pension Benefit Guarantee Corporation. Uh, as you surely know, PBGC is the federal agency founded by ERISA in 1974 to protect private sector-defined benefit plans. And when a private sector-defined benefit plan is unable to pay benefits and the plan sponsor cannot afford it, PBGC steps in, pays at least, uh, the minimum guaranteed benefit that's provided for under Title IV. In this case, involving Delta POS plan, PBGC, uh, used nearly $800 million in insurance of its insurance funds to be able to make that happen. Two things I wanted to put out front and center are this case is involving the benefits claims, um, uh, of the complaint. Um, that means the statutory entitlement of the participants under Title IV of ERISA. Uh, one component of that is surely the guaranteed benefit, the minimum guarantee PBGC pays under 1322. Uh, there's also two other components of, um, benefits that PBGC can pay. Very critical in this case. Uh, they would now allow PBGC to pay, uh, the portion of the non-guaranteed benefit. And those depend on the level of plan assets that the plan has and also the recoveries that PBGC receives on its claims. All of these components constitute the, uh, statutory, uh, entitlement determination that PBGC makes for each participant. Uh, the other thing I want to- Mr. Credit, can I, can I ask a follow-up question to what Mr. Shelley was saying with regard to potential conflicts of interest and whether that should affect our standard of review? I can see, um, where there could be a potential conflict of interest if PBGC were a for-profit corporation, uh, with stockholders whose stock value rises and falls based on what PBGC does, uh, with corporate executives whose salaries and bonuses might depend on how much money PBGC does or doesn't have at a given moment. Um, but my impression is that PBGC is, is nothing like that and, and that there's really no individual person, uh, who makes more money, uh, gets extra benefits, um, whether PBGC, uh, does everything Mr. Shelley wants or whether PBGC does nothing Mr. Shelley wants. Um, is, is my understanding of that correct or, or am I off? Uh, your honor, that's a very good, uh, point you make. I think your understanding here is entirely correct. PBGC staff that makes these, uh, entitlement determinations, there's no financial stake in the outcome. We simply, um, apply the law and the plan provisions as they are. We pay no more, no less. We don't have a financial stake in the outcome. We simply, uh, apply the law and whatever Congress decided as far as who gets what, that's what we pay. And in this case, the, the theory that the, the, the appellants have for PBGC having a financial incentive and financial staff, indeed having a financial incentive to pick winners and losers is, has no merit at all. What deference do you think we owe you? Well, first, uh, you believe that this case again is about the agency's determination of the statutory benefits elements of the participants. Uh, we believe Chevron deference has the district court made clear, uh, that it applies to PBGC's, uh, interpretations of the ERISA statute. Uh, we don't, uh, agree at all that, um, there is, there's any superseding authority that nullifies the precedent in Davis one where this court held that PBGC, even in its role, statutory, uh, trustee, let's ensure interpreting, uh, the provisions of ERISA, uh, gets, uh, a Chevron deference for its, uh, extensive knowledge in this area. So, uh, uh, Davis one applies this case. Uh, that's clear. This court, um, had examined very similar issues. The council was practically the same as in this case, the briefing was extensive and it came to that, that conclusion. We believe that PBGC and, and every aspect of its determination of statutory benefit, um, the statutory benefit element that it gets Chevron deference for those, uh, conclusions. Under the APA, uh, the courts have, uh, uh, universally considered PBGC as having, uh, their, their determinations of, of lot of facts and benefit determinations reviewed under the APA. Including a contract interpretation? Including a contract interpretation. In PBGC's brief, uh, um, a footnote, uh, can, uh, cite Seminole, uh, VFERC, uh, DC circuit 2017, and also council city of New Orleans VFERC, uh, 2012. So indeed, and also for interpretation of contract. Uh, lastly, we would note that, uh, with respect to the determination of recovery funded benefits, the statute specifically provides that PBGC determinations are reviewed under a clear and convincing standard. Um, claim two of, uh, of the, um, uh, of the amended complaint, it concerns, uh, PBGC, uh, and how we, uh, according to the appellate should, uh, deduct certain benefits that, uh, the, what's called the, what the active pilots act of the time, the plan termination, the payments that they, that they, um, um, receive via payments from the bankruptcy state to ALPA. And according to the appellants that PBC should deduct the active pilots benefits from the asset allocation. Uh, there's no support that PBC should, or even can do this. Um, but that's claimed to that, that this, uh, payments through the bank state to the and there's a long history of following plans and indeed TBG sees, uh, arguably it's only, uh, case where it was bet. The company was LTV and reviewed by Supreme court in 1990. Uh, we explained to the Supreme court why the fallen policy is, um, particularly important to PGC, uh, why this is, uh, something that potentially could cause a, an abuse, the insurance system. Um, so we do definitely take that seriously in this case, though, the bankruptcy court did not find, uh, our arguments convincing that this was a follow-on plan. Um, indeed noted the complexities of the arrangement between the bankruptcy estate and payments to help and all the multiple considerations. And so PBC decided not to pursue that line of argument. Uh, the, uh, the appeals board noted, there's nothing in the, um, uh, under a risk. And it says that, uh, benefits that are satisfied outside of the plan are somehow taken to account. Uh, one thing that the, uh, appellants tried to analogize this to is to annuity contracts, uh, which pay benefits, satisfy benefit liabilities out of the plan. That's something that's longstanding with pension plans under a Risa. In fact, the statute for PBGC that'll provides for a termination under a stand termination, uh, Wesley points to a plan satisfying its benefit liabilities through purchase of a duty contract. There there's no support at all. That would suggest that these payments that were made the bankers estate to the pilots human are anyway, analogous, um, claim three. Uh, this is the claim that, uh, Michelle, he says is central to their, uh, to their case about, uh, PC three and what benefits are included in priority category three. Uh, it, it's a question of what, uh, date the plans increased to its compensation limit that used to calculate the benefits, what data was adopted, whether it needs the five-year look back under the prior category three, uh, priority category three statute. Uh, there's two different look backs and priority category three. This gives essentially a higher status to benefits of retirees. And it requires that, uh, three years before plan termination data, Prisma has to be in pay status or could be in pay status. And more importantly to this case and to the D this court's decision 10 years ago in the Davis case and the benefits includable in PC three for the U S airways pilots. It had to do with when a benefit increase goes into effect for the five-year, uh, five-year look back period, uh, the Davis, uh, the Davis court, uh, squarely addressed the issue that PDC is interpretation of the statute. Then a benefit increases not go become in effect until it becomes operative and payable. Something that squarely applies here. Uh, the kills board showed through, uh, the, the plan document plan practice through the extra increase to the 401, a 17 limit and, uh, uh, to even the notice that, uh, appellants, um, uh, provide to say if these has increases, a retroactive cast that no event could these benefit increase to be payable for, uh, July 1st, 2002, which was less than the five-year look back and therefore not includable PC three. All right. Now, before you sit down so that Mr. Shelley can respond to this, um, there you've weighed, you've raised waiver with respect to claim four and claim five part two. Is that correct? Um, we, we raided waivers with, with respect to one of the arguments at the, uh, I don't have with respect to claim four, and then has to do with the, uh, the pilot working agreement specifying in some, in some places that there was, uh, it applied to active pilot to retard pilots All right. Um, um, we noted that even if, um, we know that the district court treated that as way, but even if, if it didn't, that, uh, there was no merit to it at the, uh, the, uh, the, the pilot agreement is clear, right? At the beginning that it covers, uh, active pilots who are currently employed by Delta and, and the fact that in certain portions of the agreement, there's a mention of retirees does not in any way show that the agreement as a whole is meant to recovery retirees as well as actives. Um, questions, first of all, on the, on the point you're just making, isn't there a definition of the bargaining unit in the CBA? Uh, I believe there is your honor. And what does it say? Um, I'm afraid I don't have that page your honor. All right. Well, my other question is about count five claim. Uh, I understand your practical, your explanation of why it's only practical for the agency to, um, to discount the, uh, numerator, I guess it is. Um, but I don't understand yet. I'd like to know what your legal argument is for applying a discount to numerator when it's specifically required for the denominator and nothing has said in the statute about the numerator. Okay. Well, uh, your honor, the appeals board reviewed this, uh, appellants arguments closely. Uh, they looked at the structure of, uh, how PBGC, uh, ERISA says that PBGC claims are valued. Uh, we also note that the statute itself under 1322 C talks about taking the value of recoveries over the amount of benefit liabilities at the plan termination date. Uh, it says value. It doesn't say, say amount has of a certain date, uh, value I think was consciously chosen. Did you say 1322 C? Yes. Go on. Uh, that's 1322 C three C and it talks about taking the value of recoveries over the, uh, amount benefit liabilities as of a certain date. Is that? I'm sorry. I frankly don't recall that. Mr. Craddock? Yes. Is that in the brief? I don't recall it. Uh, uh, not sure if we noted that in the brief, but that's, um, that's what the statute says. And so we noted in the brief that, um, there's nothing that suggests that the word, that the provision on recoveries is anything do with the amount as of a certain date. All right. Thank you. I thought Mr. uh, Ketrick that the, let me see here, that the numerator, uh, swept in through its components, that is section 1362, 1363, 1364. Um, the same requirement as in the denominator. In other words, it's expressed in the denominator, but it is incorporated in the numerator by virtue of the references to these sections. Uh, I, I, I, I, I think that's reasonable to say that, that sweeping them all together suggests that they should all be treated as, as of the plan termination date. And, um, I think that's something that is central to the Title IV program is that valuing everything as the plan termination date essentially allows PBGC to operate and implement, uh, the statutory provisions and matching assets to liabilities and, and so forth and implementing 1322C. All right. Um, any more questions? No, if I could, if I could follow up on Judge Ginsburg's question about what's the scope of the bargaining unit and the collective bargaining agreement. Um, I've got JA 1362, which is part of the pilot working agreement, and it says the union represents, quote, a majority of the airline pilots employed by the company, um, and their designated airline pilots, um, and the association represents them. Is that your understanding that with the pilot working agreement, there was a company and there was a union and the union represented the, um, pilots, uh, uh, the airline pilots employed by the company? Yes, Your Honor, that, that's an understanding. That was the appeals board's conclusion looking at, um, the, uh, the appellate's arguments, the pilot working agreements provisions as a whole, and also looking at case law, um, which says that, uh, which holds that a collective bargaining agreement is not presumed to be, uh, representing other than currently actively employed employees. And we'd also note that, uh, if it was, uh, read otherwise, that would basically call into question the plans, uh, fourth amendment implementing the, the, um, uh, the annual, uh, benefit increases. And so, uh, the appeals board saw no reason to do so. Uh, the law certainly allows plans to, with respect to increasing 401A 17 compensation limits or 415B annual benefit limits that plans do not have to adopt them. Uh, those are simply the caps. And so the plan was allowed to provide a treatment for the two different groups. And that's what the plan did. And on the fourth amendment, uh, my, my understanding is the pilot working agreement was arm's length negotiation union on one side company on the other side. I'm not as clear on the, the fourth amendment. Did the company just do that unilaterally or were they bargaining with somebody? No, that was the plan adopting essentially implementing, uh, uh, amendment to the plan document itself. The pilot working agreement, uh, can be a plan, uh, operative plan document, uh, not necessarily part of the formal plan document. And we concluded it was for the act, Cleveland Floyd, uh, Delta pilots as of the, I think it was, uh, June, 2001 date. Uh, but it wasn't until the fourth amendment that there was a plan, uh, uh, amendment that affected the retirees. And in other words, the appellate's in this case, and that was in 2003. All right. Are we ready for the rebuttal? Mr. Shelley, you have, um, I think you have some time remaining. Uh, why don't you take two minutes in any event? Thank you, Your Honor. I'd like to address, uh, the question you, Judge Henderson asked about, uh, claim four and the waiver issue. Uh, the pilots didn't waive, uh, this issue that the, um, that the working agreement covered retirees or addresses retiree interests as well as active interests. And in fact, at, uh, JA 737, we specifically had this language, nothing in the actual language of section 26 G can reasonably be read, be read to support the PBGC's inference that the plan amendment applied only to certain plan participants. The district court was very harsh in saying that wasn't good enough. You had to scope out the argument in every single detail, even though the PBGC had hardly even told the participants what the argument, what they were doing before the appeal was raised. Um, but in any event, there's no issue exhaustion required under at least ERISA cases like Wallace and Vaught. So we did appropriately raise it, but wouldn't have had to because a fiduciary is supposed to raise appropriate issues on the substance of the working agreement. The fact that it was negotiated between a union and the employer is one thing, but the reality is, is that the document actually addresses retirees. I'd point the court to point, uh, uh, the appendix page 1616, where there's a whole section on retiree medical benefits. And then in Mr. Shelley, yes. Don't all of the ref, the few references that I checked in the, in the agreement that referred to retirees are actually referring to the retirement benefits or conditions for current employees when they later retire. That's not true, your honor. In fact, uh, in various spots, such as page JA 1616, and also I think in sections, uh, it's, I believe 26 K, um, it talks about retirees who retire after, I think 1997. Um, so these are people who are already retired, uh, at the time the, the working agreement assigned in 2001. Um, so it's, it's, it may be that it's being negotiated. The retirees aren't at the table, but the plan is being amended with respect to also all, all sorts of people, including, including retirees. Is that 1616? Yes. 1616. Right there. Okay. So on the bottom of page JA 1616, uh, effective for pilots who retire after January 1st, 1997, the following provisions will apply. Those are pilots who are not active currently. What's the date of this agreement? Pardon me? What is the date of the agreement? Uh, I believe it is June, 2001. Uh, and then if you look at page 1644, uh, excuse me, not 1644, but 1648, uh, again, I think in retirees to continue to receive full pension benefits. So the effective date of the agreement, they're talking about people who are already retired. And then on the next page, there's a reference in K 13 to, um, for purpose, uh, again, to, uh, to the retirement plan and, uh, those who terminate employment after May 1st, 2000, which is also before the, before the, the date of the agreement. So on the bottom of page 1644, uh, 1616, effective for pilots who retire after January 1st, 1997, why doesn't it say retired if they're already retired? Uh, because I, I think that they didn't want to cover retirees before, um, uh, before. Well, I think that the wording is intended to limit this particular aspect of the, of the agreement to those who retired after a certain date, as opposed to those who retired before a certain date, because you just said retired. Yes. I did say that your honor, but I don't think there's someone could retire on in July of 2001, effective, even, uh, retroactively effective to I'm not, I'm not aware that that's an option under the plan or in reality. And then at 1648, number nine at the bottom. Yes. So this, um, where does this, this all comes from a provision saying, I believe previous page, is that right? Yeah. So I think it provided in section 26 K three B. Yes. Effective. So it says as, so this would be K it starts with K on page J a 1646. The preamble is the retirement plan, MPPP bridge plan and supplemental annuity plan will be amended to reflect the following. Number nine, as of the effective date permit Delta pilot retirees to continue to receive full pension benefits during the periods of time they are employed by Delta airlines, global staffing services, or its successors. So K is all about something that will be amended in the future. And it will be amended to the benefit of people to some people are already retired. Correct. Correct. Yes. And the next, excuse me, and then the next page, um, for purposes of determining retirement benefits under the retirement plan, the bridge plan, uh, for pre these are people who would have already been retired at the time of the agreement. Our point is that the, it is a very parsimonious reading of this agreement to say that it, it, uh, that it only covers actives. And in fact, it covers many retirement issues for people who are already retired and it was intended to do so. And when it wanted to address just active pilots, it, it said so. Uh, and, um, I think those provisions assist in that construction. And do you have access to the, um, definition of the bargaining unit? Uh, it was, if I don't recall the page it was on, but I Yes. Um, and I don't, uh, I don't disagree that, that this is not an agreement, uh, in which some retiree organization was signing on the bottom line, but Delta as Delta, as the, um, settler, as the sponsor of the plan had the ability, uh, in whatever capacity, uh, and negotiating with whoever to amend the, to amend the retirement plan and did so. And it is in the, it is in 26 G where it said that, um, whenever benefits could be paid, um, they, uh, whenever, uh, for instance, congressional increases occurred, they shall be immediately effective for our plan. Thank you. Can I, can I ask Mr. Shelley, um, going back to the question about the numerator and the denominator, uh, and your claim five and whether or not, uh, the interest should have been applied. Um, let me walk through how I, how, how I'm reading the statute and you, you can tell me, um, where, where I go off the rails, but I've got the, the red addendum, addendum to the appellee's brief. Okay. And the first statute in it is 1322. And I'm on page three of that addendum, which is the statute that Mr. Credit, uh, it's 1322 C three C. Yes. And there it describes the ratio, the recovery ratio, and it's got a Roman numeral one and a Roman numeral two. I think Roman numeral two is, is clear enough. Um, it's the amount as of the termination date quote amount dot, dot, dot quote of the termination date. So then the other, the question is, well, what's the other side of the ratio? And it says the value dot, dot, dot under section 1362 among other sections. So I take that to mean I go to section 1362, which is on page 19 of the addendum. And when I get there, I'm at 1362 B one a 1362 B one a on page 19 of the addendum. And there it talks about the amount I'm on the second line of it dot, dot, dot, as of the termination date. And then in the next line, it talks about, uh, interest dot, dot, dot calculated from the termination date. So it looks to me like, not only is there some kind of logic to Mr. Credit's argument that when it comes to the numerator, the denominator, we should be comparing apples to apples, but it seems like the text of the statute probably requires that we make the numerator apples. If the denominator is going to be apples, we can all agree. The denominator is the amount as of the termination date. And when we looked at section 1362, we see with regard to the numerator, it is also saying the amount as of the termination date with interest calculated from the termination date. So I don't pretend that I'm, I'm sure of this. And I suspect you disagree. So please tell me if I'm wrong, tell me, tell me why I'm wrong. Uh, well, I, section 1362 B1A, I don't believe addresses the recoveries. It addresses liabilities, um, when it mentions the termination date. Uh, and importantly, what this is, a reading like this will lead to the result that if the, if the recoveries, uh, if the value of the recoveries would decline when going back to, to the termination date. So let's say there's a stock market crash, like there was in March of this year. And the recovery comes immediately after that. If you have to go backwards and not just this in that case, not discount, but upgrade the value of the recoveries, they could be worth 50, maybe 60% more than what they were the actual amount. And the way this formula works, it would result in more money having to be, uh, accorded for the allocation process than the trustee actually collected. And so that's why I think Congress didn't include this termination date in, in the numerator, because it's simply took what was collected and then put it into a formula. There, there would be as much reason not to want to, uh, uh, not, not to want to upgrade the value as to discount the value. So I don't, I think it was purposeful that the, that the provision, uh, in C1 of 1322 does not, uh, does not reference the termination date because otherwise you could have these anomalous situations where the trustee has to make up the funds from its own money. And if the PBGC isn't the trustee, the private trustee certainly has no money at all to access. Oh, Mr. Shetley, the Mr. Credit has now highlighted a second distinction between C1 and C2. You've been focusing on the absence of a reference to the termination date in the numerator, but he's drawn our attention to the difference between the value and the amount in one and two respectively. What do you make of that? Well, it's an argument that hadn't been raised, uh, yet. So uh, it's, it's a new argument. Uh, it is a different word. I'm quickly looking up the, the word, what the word value means in, in the def in, um, in the dictionary, uh, uh, which is the monetary worth of something. Um, and, uh, is it synonymous with amount? Probably. Could it have a slightly different meaning than amount conceivably, but- Well, I don't see how we can treat that as insignificant and the other as significant. Yes. Well, if the word value can, uh, be, uh, can be expanded to include a current versus, current versus prior value, I think you'd have to have a different word in front of it in order to allow the discounting that the PBGC did. It's earlier value or it's as opposed to, or past value as opposed to present value. Um, so I don't think the word value alone can answer the question of why the termination date wasn't in there. And again, I go back to the, I go back to the point that Congress would have a purpose in wanting the exact value of the recoveries at the time of, uh, their actual recovery to be, to be the, um, to be the threshold. Because if you do this discounting, you're going to have to do upgrading and take into account greater amounts that might've been lost because of a loss in the asset. And you mentioned that you think 1362 is talking about liabilities, not recoveries. Um, but 1322 tells us to look to 1362. So when I looked at 1362, I agree with you that it's using the word liability, but it's not, at least so far as I can tell, using the word recovering anywhere. So if 1322 is saying, let's do some, let's figure out the value of the recovery and let's figure out that value based on 1362, we have to use 1362. We have to use some part of 1362. And so far as I can tell, no part of 1362 mentions recoveries. And since we have to use some part of it, it seems like the most logical place to look is, uh, when it's describing how you figure out the amount of something, even though 1362 in its own context, talking about the amount of liability. And I could be missing recovery. It might mean it's, it's not a particularly short, um, 1362 is not particularly short. So it may be in there. I just don't, don't see it. I think it, I think that the, the, the symmetry between termination date and 62 and the, and the, the, um, use of termination date in 1322C is related again to the liabilities because the first part of the product in this, in this formula is the outstanding amount of benefit liabilities under the plan, including interest calculated from the termination date. And you, this is under 1322C to big A, and then you have the applicable recovery ratio, where again, there's no mention of dating. And so I think this number can be very large, this, this outstanding amount of benefit liabilities, and it's unrelated to the actual recovery amount. And that's what causes the prospect of the trustee having to pay more than he or she actually collects back to the plan. And so I think the 1362 language closely tracks what's in 1322C to big A, as opposed to the B and C. If I could make one more point, although I know I'm well into my time, and that's back on the conflict of interest point that Judge Walker raised, in that we don't say that any individual within the PBGC had a monetary interest in order to, you know, limit the recoveries of, of the retired pilots. But MetLife versus Glenn, which is the ERISA case that talks about conflicts of interest, talks about not scienter in the mind of the decision maker, but structural conflicts of interest that implicitly can cause the decision maker to rule one way or the other. And here is, we have a situation where the PBGC regularly notes that it doesn't have sufficient funds to do its, to meet its obligations and goes to Congress for additional appropriations to the extent it can raise it, raises insurance premiums. And the, the, it's a structural conflict of interest. There's no question that by delaying the payments and giving them to active beneficiaries, as opposed to retired beneficiaries, the PBGC earned money for its own operations, probably millions and millions of dollars. And that, that, that, that shouldn't be disregarded. Thank you. All right. If there are no more questions, gentlemen, the case is submitted. Thank you. Thank you.
judges: Henderson, Walker, Ginsburg